1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

3    UNITED STATES OF AMERICA              :
                                           :
4         v.                               : Case No. 98-13E
                                           :
5    BRIAN LAMONT GREENE                    :

6

7

8

9         Hearing in the above-captioned matter held on

10    Tuesday, March 14, 2006, commencing at 1:47 p.m.,

11    before the Honorable Maurice B. Cohill, in the United

12    States District Court, 17 South Park Row, Erie,

13    Pennsylvania 16501.

14

15

16

17    For the United States of America:

18         Christine Sanner, Esquire
           U.S. Attorney's Office
19         17 South Park Row, Room A-330
           Erie, PA 16501
20
      For the Defendant:
21
           Thomas Patton, Esquire
22         Federal Public Defender's Office
           1001 State Street, Suite 1111
23         Erie, PA 16501

24

25              Reported by Sondra A. Black
            Ferguson & Holdnack Reporting, Inc.

1                           I N D E X

2

3    DAVID CONDE

4         Cross-Examination by Ms. Sanner........................4

5         Direct Examination by Mr. Patton.....................13

6         Recross-Examination by Ms. Sanner....................16

7

8    KELLIN STRONG

9         Direct Examination by Ms. Sanner.....................17

10        Cross-Examination by Mr. Patton......................25

11        Redirect Examination by Ms. Sanner...................35

12

13   EXHIBITS

14

15        Government's Exhibit No. 1.............................6

16        Government's Exhibit No. 2.............................6

17        Government's Exhibit No. 3............................23

18        Government's Exhibit No. 4............................23

19        Government's Exhibit No. 5............................23

20        Government's Exhibit No. 6............................23

21        Defendant's Exhibit A................................38

22

23

24

25

1              THE COURT:  This is the time set for a hearing on a

2       motion from the probation department to show cause why --

3       Brian Lamont Greene should not show cause why his supervision

4       should not be revoked.  So with that, I guess, Ms. Sanner,

5       we'll start with you.

6              MS. SANNER:  The Government would call US Probation

7       Officer David Conde.

8              MR. PATTON:  Your Honor, let me clarify.  There are

9       two violation allegations made in the Petition.  One is that

10      Mr. Greene used marijuana, we are not contesting that

11      allegation.

12             THE COURT:  The other, employment --

13             MR. PATTON:  That is correct, and we are contesting

14      that.

15             THE COURT:  Would you come forward and be sworn.

16

17             D A V I D   C O N D E, first having been

18             duly sworn, testified as follows:

19

20             THE COURT:  Have a seat, please.  Give us your name,

21      and spell your last name.

22             THE WITNESS:  My name is David middle initial J.

23      Conde, C-O-N-D-E.

24

25

1                          DIRECT EXAMINATION

2    BY MS. SANNER:

3

4        Q.    How are you employed?

5        A.    I'm a probation officer for the Western District of

6    Pennsylvania.

7        Q.    How long have you been so employed?

8        A.    This coming April will be 16 years.

9        Q.    What are our some of your duties as a US probation

10   officer?

11       A.    To conduct investigations for the court; supervise

12   individuals who have been sentenced by the court who are on

13   probation, term of supervised release; or also, in addition,

14   supervise any other cases that may be referred to our office.

15       Q.    Is one of the cases referred to your office having

16   to do with Brian Lamont Greene?

17       A.    Yes, ma'am.

18       Q.    And he was convicted on May 18, 1999?

19       A.    Yes, ma'am.

20       Q.    That was for Conspiracy to Distribute and Intent to

21   Distribute Cocaine and Cocaine-Based Powder?

22       A.    Yes, ma'am.

23       Q.    And for that he was sentenced to 60 months

24   incarceration?

25       A.    Yes.

1      Q.   But his sentencing guidelines, the range would have

2   been 121 to 151 months incarceration?

3      A.   Yes.  Originally, at the time of sentencing, he was

4   facing that guideline.

5      Q.   So he received a downward departure for a (5)(k)?

6      A.   Yes, ma'am.

7      Q.   On April 1, 2003, was Mr. Greene absent without

8   leave from home confinement?

9      A.   Yes.  There was information received in the file

10   that he had been AWOL from home confinement.

11      Q.   And he was arrested at that time and incarcerated at

12   the Franklin County Jail?

13      A.   Yes, ma'am.

14      Q.   And following that release from jail he was placed

15   in the Elvis House?

16      A.   Yes.

17      Q.   In June 2003 he escaped from the Elvis House?

18      A.   Yes, ma'am.

19      Q.   And at that time he tested positive for marijuana

20   use?

21      A.   Yes, ma'am.

22      Q.   He was again arrested and incarcerated at the

23   Franklin County Jail?

24      A.   Yes, ma'am.

25      Q.   And on January 30, 2004 he was released for

1    supervision at the Southern District of Ohio?

2        A.    Yes.   The Southern District of Ohio, Columbus

3    office.

4            MS. SANNER:   May I approach with the terms and

5    conditions?

6            THE COURT:   Sure.

7        Q.    I'm showing you what's been marked Government's

8    Exhibits 1 and 2.   Do you recognize Government's Exhibit 1?

9            (Government's Exhibit Nos. 1 and 2 marked for

10            identification.)

11        A.    Exhibit No. 1 would be the judgment order that was

12    issued by this Court on May 20th of 1999.

13        Q.    And Exhibit No. 2?

14        A.    Exhibit No. 2 is what we call Probation Form 7A,

15    which is the conditions of probation and supervised release.

16    The form shows that it was for the Southern District of Ohio,

17    and it was executed by United States Probation Officer Lorie

18    Johnson of the Columbus, Ohio office on February 4, 2004.

19        Q.    What were some of the conditions that Mr. Greene

20    faced at the time of his supervision?

21        A.    Some of the things that we have checked off, of

22    course, is not to commit any other federal, state, or local

23    crime; possess firearms or destructive device; report within

24    72 hours from release of the Bureau of Prisons; submit to a

25    drug urinalysis within 15 days of being placed on

1  supervision.  Of course, there are the standard conditions,

2  which include being employed; which includes refraining from

3  the purchase, possession, use, distribution, administration

4  of any narcotic or other controlled substances.  There is

5  also a special condition that the Defendant participate in a

6  program of testing, and if necessary, treatment for substance

7  abuse.

8      Q.   While Mr. Greene was on supervision, he started in

9  February of 2004 to look for employment, supposedly, at a

10  gym?

11      A.   Yes, ma'am.

12      Q.   And he expressed to the probation officer his intent

13  to become a personal trainer?

14      A.   Yes.  He had discussed getting recertified as a

15  personal trainer.

16      Q.   But about one month later, in March 2004, he still

17  needed to get certified to be a personal trainer?

18      A.   Yes.  He had indicated to the probation officer that

19  he was attempting to get the money to be able to do such a

20  thing.

21      Q.   And at that point, in March 2004, he still hadn't

22  had the money together to apply for the certificate?

23      A.   Correct.

24      Q.   He was told by the probation officer that he needed

25  to find another job while he was waiting?

1        A.   At that particular time that's what the officer

2   stressed, yes.

3        Q.   In April of 2004, Mr. Greene got the certificate for

4   training?

5        A.   I'm sorry, can you say that again.

6        Q.   In April 2004, Mr. Greene eventually got the

7   certificate for personal training?

8        A.   I believe so.

9        Q.   But the gym that he said was going to hire him

10  imminently did not, in fact, choose to hire him?

11       A.   That is true.

12       Q.   He expressed his intent to the probation officer to

13  work at the mall or perhaps play professional football?

14       A.   He had mentioned to the probation officer that he

15  had the opportunity to perhaps get employment at Eastland

16  Mall, which I assume is in the Columbus area.  Also, that he

17  had been able to have the opportunity to play for an arena

18  football team by the name of Columbus Fire, and also, that he

19  may -- well, may have -- that he had gotten some additional

20  employment through the coach of that team, by the last name

21  of Clinton, working for a security company that that

22  particular coach had.

23       Q.   At that point Mr. Greene was on supervision for a

24  couple months, and the probation officer told him he needed

25  to get a job?

1      A.    Yes.

2      Q.    And the Defendant's response was that he was going

3  to have a problem with the probation officer over the next

4  five years?

5      A.    He made a comment to the probation officer that, if

6  he wasn't able to talk to the PO, that apparently him and her

7  would have a problem for five years.

8      Q.    Because he wanted to enjoy whatever job he was

9  doing?

10     A.    Basically.

11     Q.    In April of 2004, he obtained a security position at

12  Hammerstrength Security?

13     A.    Yes.  That would have been the company with --

14  again, that Coach Clinton --

15     Q.    Had referred him to?

16     A.    Yes.

17     Q.    But within a couple weeks the probation officer

18  talked to the employer and was told that the security job had

19  not worked out?

20     A.    The probation officer spoke with this Mr. Clinton,

21  and he had indicated that Mr. Greene had worked several

22  shifts for him, but had not worked as many shifts as he

23  wanted him to work, and that Mr. Clinton was given the

24  impression that Mr. Greene was still in between moving from

25  the Canton, Ohio area to Columbus, Ohio area so he was not

1     available for as much employment or opportunity to work.

2         Q.   In that same month, May 2004, Mr. Greene supposedly

3     had another contact with an employer by the name of Beth Neal

4     who had a store at the Eastland Mall?

5         A.   Yes.

6         Q.   Ms. Neal was contacted, and she confirmed that the

7     Defendant was working for her?

8         A.   She indicated the Defendant would be working for

9     her.  I believe the name of the store was Tag Designs.

10        Q.   Could it be Tag Me Designs, something like that?

11        A.   Yes.

12        Q.   What is the relationship, if you know, between Beth

13    Neal and the Defendant?

14        A.   My understanding is that is his aunt.

15        Q.   In June of 2004, the probation officer went to Tag

16    Me Designs at the mall?

17        A.   Yes.

18        Q.   And the owner, who was present at the store, said he

19    didn't know and had never met the Defendant?

20        A.   The probation officer indicated that it was a kiosk

21    in the mall, which is one of those little stands, and that

22    the individual she spoke to could not identify or knew who

23    Mr. Greene was.

24        Q.   Around that time the probation officer attempted to

25    make several home visits with Mr. Greene?

1       A.   That is correct.

2       Q.   But was unsuccessful?

3       A.   Correct.

4       Q.   In August of 2004, Greene admitted to the probation

5   office that he was not working full-time?

6       A.   That is correct.

7       Q.   And at that time they collected a urine specimen

8   from him?

9       A.   That is correct.

10      Q.   But that urine specimen was invalid and diluted?

11      A.   Yes.  The lab came back with that result.

12      Q.   Another test was made on December 3, 2004?

13      A.   Yes.  Yes.  Another test was taken several weeks

14   later.

15      Q.   That urine specimen tested positive for marijuana

16   use?

17      A.   Yes, it did.

18      Q.   In September of 2004, the Defendant, meeting with

19   the probation officer, told the probation officer that he

20   moved three weeks earlier without informing the probation

21   officer?

22      A.   That is correct.

23      Q.   And he said at that time that he was working for

24   Beth Neal at Urban Kids Clothing in the Canton Mall?

25      A.   Yes.

1      Q.   Now, this Beth Neal is still his aunt?  The same

2    woman that --

3      A.   Yes.  The same woman that we mentioned back in April

4    and May.

5      Q.   For Tag Me Designs?

6      A.   Yes.

7      Q.   He submitted an invalid urine sample at this time,

8    on September 26, '04?

9      A.   Yes.

10      Q.   And later admitted to drinking a lot of water in

11    hopes of diluting the sample?

12      A.   Yes, he did.

13      Q.   The probation officer tried to verify employment

14    with Ms. Neal, but her phone would not accept incoming calls?

15      A.   Yes.  That was attempted by the officer, yes.

16      Q.   But the Defendant continued to report that he's

17    working for Neal at Urban Kids in Canton Mall?

18      A.   Yes, he did.

19      Q.   He admitted that it wasn't full-time and that he

20    didn't have verification?

21      A.   That is correct.

22      Q.   And in November of 2004, Neal, the Defendant's aunt,

23    does admit that he's working -- that the Defendant is working

24    for her at Urban Street Kids?

25      A.   Yes.  After the Defendant met with the probation

1    officer, approximately seven or eight days later, he provided

2    a valid contact for Ms. Neal.  And the probation officer

3    contacted her, and she indicated that he was working for her.

4        Q.  He indicated that he had some kind of consulting

5    agreement with Beth Neal?

6        A.  Something of that sort was provided at some -- at a

7    later date, yes.

8        Q.  Around this time, January of 2005, his supervision

9    was transferred to the Northern District of Ohio?

10       A.  Yes.

11       Q.  And at that point he would have been supervised by

12   Kellin Strong?

13       A.  Yes.  He was supervised out of the Youngstown

14   office, Kellin Strong.

15            MS. SANNER:  Your Honor, the Government would call

16            US probation officer -- I'm sorry, pass the

17            witness.

18                        CROSS-EXAMINATION

19   BY MR. PATTON:

20

21       Q.  Mr. Conde, is it fair to say that the testimony

22   you've given about Mr. Greene's work history up to this point

23   is based mainly on reviewing notes from the officer that was

24   supervising Mr. Greene in the Southern District of Ohio?

25       A.  Yes.  That information's being garnered from the

1    chronological entries of Officer Johnson of the Columbus,

2    Ohio office.

3        Q.   And Mr. Greene was being supervised there from the

4    time he was released onto supervised release in January of

5    2004 until -- his supervision got transferred when?

6        A.   He was on supervision with the Columbus office for

7    approximately a year.  He was released January of '04, and

8    the case was transferred to the Youngstown office in January

9    of '05.  So approximately a year.

10       Q.   During that time period the probation officer in the

11   Southern District of Ohio verified Mr. Greene's employment at

12   this store with the tags -- that did business with selling

13   the dog tags or serial tags?

14       A.   The Tag Me Designs?

15       Q.   Yes.

16       A.   Well, you have two verifications really.  One is the

17   telephonic conversations that she had with Beth Neal

18   indicating that he was going to be employed there.  But then

19   a physical confirmation at the actual site of the store

20   failed to confirm that he was working there.

21       Q.   But Ms. Neal confirmed that he was working there,

22   correct?

23       A.   She did.

24       Q.   And she was the owner of the facility, correct?

25       A.   That is my understanding.

1      Q.  Ms. Neal also verified, later in the year, that

2  Mr. Greene was working at a different store of hers, a

3  children's clothing store, correct?

4      A.  Yes, she did.

5      Q.  There was a period of time during this year where

6  Mr. Greene was actually playing football for this arena

7  football team, correct?

8      A.  The chronologicals really don't make it clear.  I

9  mean, there's one entry made in which he claims to the

10  probation officer that he would be playing for this team, but

11  then there is no further entry, and I don't know if that

12  actually occurred.  I can only say that the statement was

13  made to her, she put it in the chronos.  Whether or not he

14  actually did, I do not know.

15      Q.  The probation officer had indicated to Mr. Greene

16  that actually playing football for this arena league would be

17  acceptable employment, correct?

18      A.  I assume.

19      Q.  The probation officer did talk with Mr. Clinton, who

20  was the coach of this football team, correct?

21      A.  Yes.  Yes.

22      Q.  And it was Mr. Clinton who owned the security

23  company that Mr. Greene worked for at least for some period

24  of time?

25      A.  Yes.

1      Q.   And Mr. Clinton then did confirm that Mr. Greene had

2    been doing some work for that company; is that correct?

3      A.   Yes.

4      Q.   So you don't know if there was a period of time in

5    which Mr. Greene was actually playing football?

6      A.   I do have -- I have no idea.  Like I said, there's

7    only one entry in regards to the arena football.

8      Q.   Which indicated that -- and the coach -- well, that

9    entry indicated that Mr. Greene was going to be playing for

10   that team, and that, also, the coach of that team may also

11   have some other side employment for Mr. Greene, correct?

12     A.   That is correct.

13     Q.   And Mr. Greene did then end up getting work with the

14   football coach's security business, correct?

15     A.   It seems for a limited period of time, yes.

16          MR. PATTON:  Those are all my questions, Your Honor.

17          THE COURT:  Anything further, Ms. Sanner?

18

19                    REDIRECT EXAMINATION

20   BY MS. SANNER:

21

22     Q.   As far as the football goes, the Defendant expressed

23   his tiredness at working at the couple of practices that he

24   actually worked at?

25     A.   Yes.

1          Q.   And the security, he actually only worked a few

2     times there because he told the employer that he wasn't

3     available too much because he was planning on moving?

4          A.   Correct.

5               MS. SANNER:  Nothing further for this witness.

6               THE COURT:  Thank you, Mr. Conde.

7               MS. SANNER:  The government would call Kellin

8     Strong.

9               THE COURT:  If you would come forward and be sworn,

10    please.

11

12          K E L L I N   S T R O N G, first having been

13          duly sworn, testified as follows:

14

15               THE COURT:  Have a seat please.  Give us your name,

16    and spell your last name.

17               THE WITNESS:  Kellin, K-E-L-L-I-N, Strong,

18    S-T-R-O-N-G.

19

20                       DIRECT EXAMINATION

21    BY MS. SANNER:

22

23          Q.   What is your job title?

24          A.   US probation officer for the Northern District of

25    Ohio.

1       Q.    You're employed in the Northern District of Ohio?

2       A.    Youngstown office.

3       Q.    As part of your duties you were assigned to

4    supervise the Defendant?

5       A.    Yes, ma'am.

6       Q.    Do you see the Defendant in the courtroom today?

7       A.    Yes.

8       Q.    Would you identify him for the record.

9       A.    He's sitting next to his attorney at the defense

10   table.

11      Q.    On January 10th of 2005, you were told the Defendant

12   was working at Tag Me Designs for Beth Neal?

13      A.    Yes.

14      Q.    And Beth Neal is the Defendant's aunt?

15      A.    That, I'm not sure of.

16      Q.    But she is somehow related to the Defendant?

17      A.    That, I wouldn't think so.  I wouldn't think so.

18   Nothing inside the file stated that they were family.

19      Q.    You understood from Ms. Neal that there may have

20   been locations at different malls for her stores?

21      A.    Exactly.

22      Q.    And around this time you had a few unsuccessful home

23   visit attempts to confirm the Defendant's employment with Tag

24   Me Designs?

25      A.    Yes, ma'am.  As well as we talked at length to get

1    him to verify his employment as well.

2        Q.    But were unsuccessful?

3        A.    Exactly.

4            THE COURT:    When you say "unsuccessful," what's that

5    mean?   I mean, he just wasn't there or --

6            THE WITNESS:    A couple times I called I couldn't --

7    he was not at work, as well as I couldn't get ahold of

8    Ms. Neal.   Very hard to get ahold of.

9        Q.    In February of 2005, did you sign Mr. Greene up for

10   the Breakfast Club?

11       A.    Yes, I did.

12       Q.    Would you tell the Court what the Breakfast Club is.

13       A.    The Breakfast Club is something I put in place for

14   all of my clients who are unemployed, which they have to go

15   and fill out a form -- they have to contact five employers

16   every day, and see me every day by noon and verify that

17   they've gone out to find employment.

18       Q.    And you did this because Mr. Greene was not

19   employed?

20       A.    He was not employed.   The situation with Kids Urban

21   Street was the fact that we couldn't get him to verify his

22   income, how he's being paid there.   I could not get it

23   verified through Ms. Neal because I was unable to contact

24   her.   And then, eventually, he expressed a desire not to work

25   there because -- due to travelling from Youngstown to Canton

1    and Akron.  And then, along came his next employment with his

2    aunt at American Maintenance.

3         Q.   Did Mr. Greene report twice to the Breakfast Club?

4         A.   Yeah, for the most part.  His attendance was between

5    80 and 90 percent showing up.

6         Q.   At some point he stopped showing up?

7         A.   Yeah.

8         Q.   You attempted a home visit in June of 2005?

9         A.   Yes.

10        Q.   And you learned at that point that nothing had

11   changed in regards to Mr. Greene's employment?

12        A.   No.

13        Q.   So as of that point he still was not employed?

14        A.   Still was not employed.

15        Q.   In July of 2005, he told you he was not employed

16   because he was a full-time student?

17        A.   Yes.

18        Q.   In August of 2005, you learned that he was not in

19   school?

20        A.   Yes, ma'am.

21        Q.   But he was still not employed?

22        A.   Still not employed.

23        Q.   And you told him to report daily to you on your --

24   his job search activities?

25        A.   Yes, ma'am.

1          Q.    In September of 2005, he told you he was working at

2     a clothing store by the name of Connect?

3          A.    Yes, ma'am.

4          Q.    Did he tell you who owned the store?

5          A.    Initially he -- he contacted me to inform me that he

6     was able to secure employment at Connect, but he could not --

7     he could not tell me -- I asked him who was the supervisor,

8     who owned the business.  Mr. Greene did not know -- he

9     informed me that he did not know who the business owner was.

10    The Connect Clothing Store is probably a quarter the size of

11    the courtroom, Your Honor.  And what I asked him was, for a

12    business that small, it's almost impossible to not know who

13    owns the business.  Mr. Greene told me he did not know who

14    owned the business.  I said, all right.  We have to find out

15    who owns the business.

16          Two days later, Mr. Greene comes in with this

17    contract form, which is the same form with Kids Urban --

18    Urban Street and Tag Me Designs.  I said, well, how is -- so

19    Ms. Neal owns it.  And he says, yes.  I said, but I asked you

20    the day before and you didn't know who owned it.  And you

21    previously worked with her before, how would you not know she

22    owns the business that you claim that you're working at now.

23    He couldn't give me anything.

24          So after that I followed up, I went over to the

25    Mahoning County Courthouse and checked the business

1    registration, the ownership of the building, and everything.

2    And the registration of the business came back as -- had Mr.

3    Greene listed as the vice president of the company.  So we

4    have two conflicts now.  First you didn't know who owns the

5    business.  Then you told me that Ms. Neal owns the business

6    and you wanted to work under the same contract that you have

7    here from a previous employer that you didn't know now who

8    owns the business that you working at, and now, mysteriously

9    you're listed as the vice president of the company you don't

10   know who owns.

11        Q.   So you felt Mr. Greene was being deceptive?

12        A.   Very.  Very.

13        Q.   You conducted monitoring of the store at the mall?

14        A.   It's not at the mall.  It's -- it's on Market

15   Street, on the main strip.

16        Q.   When you conducted surveillance, did you see if the

17   business was open?

18        A.   They were in the process of just opening the

19   business.  So there was a lot of activity, they were setting

20   up shop and putting in clothing and everything else like

21   that.  But for the most part the business, at this point in

22   time, never got fully up.  It was not open full-time.

23        Q.   Can you describe the activity that was going about

24   the business.  Did it appear to be business-related to you?

25        A.   My personal opinion, I would almost -- I pretty

1    much -- like without having any further evidence, I looked at

2    it pretty much as a front.  Pretty much young men going in

3    there, all the fancy cars, the 20-inch rims, and everything

4    like that.  A lot of traffic in and out of the building on a

5    regular basis.  I conducted surveillance there, and the

6    business wasn't open yet.

7        Q.    You observed a lot of young males around?

8        A.    Nine to 10 young men.

9        Q.    And very little clothing?

10       A.    Very little clothing at the time.

11       Q.    In September of 2005, after you conducted some

12   surveillance of this business, you asked Mr. Greene to submit

13   a urine sample?

14       A.    Yes, ma'am.

15       Q.    And he tested positive for marijuana on that date?

16       A.    Yes, he did.

17            MS. SANNER:  Your Honor, may I approach?

18            THE COURT:  Sure.

19       Q.    I'm showing you what's been marked Government's

20   Exhibits 3, 4, 5, and 6.  Do you recognize them?

21            (Government's Deposition Exhibit Nos. 3, 4, 5, and 6

22             marked for identification.)

23       A.    Yes, ma'am.

24       Q.    Can you tell the Court what they are.

25       A.    These are drug letter confirmations from Crowe

1    Laboratories stating the positive drug test.  One specimen

2    here was a urinalysis collected September 30th, which came

3    back positive for THC, which is marijuana, which was

4    confirmed on October the 7th.

5          Exhibit 4 was for a urinalysis collected on October

6    26, 2005.  The analysis also returned positive for marijuana

7    on November 11, 2005 by Crowe Laboratories.

8          As well as Exhibit No. 5, which was submitted on

9    October 27th -- this was October 27th.  That came back

10   positive as well for marijuana, but in addition for

11   Hydrocodone and Hydromorphone.  Those tests were confirmed

12   positive on November the 11th.

13   Q.   After Mr. Greene first tested positive for marijuana

14   on November 30th -- I'm sorry, September 30th, he was

15   referred to PSI care for drug and alcohol counseling?

16   A.   Yes.

17   Q.   Did Mr. Greene attend his treatment as required?

18   A.   Mr. Greene went to his -- he went to his initial

19   drug and alcohol assessment.  Then, after that, he failed to

20   participate in anything else.

21   Q.   He failed to appear for a drug test on November 4th,

22   8th, 9th, 10th, 11th, 15th, 17th, and 18th of 2005?

23   A.   Yes.  And then, eventually, we discharged him as a

24   program failure.

25          MS. SANNER:  Your Honor, the Government would offer

1    Government's 1 through 6 into evidence.

2            THE COURT:  One through six are admitted.

3            Mr. Patton?

4

5                    CROSS-EXAMINATION

6    BY MR. PATTON:

7

8        Q.   Mr. Strong, you've been supervising Mr. Greene for

9    roughly a year?

10       A.   Yes, sir.  Actually, 10 months.  He's still under my

11   supervision, but Mr. Greene -- I have not had any contact

12   with Mr. Greene since November the 1st.  He's never reported

13   back into the office or anything else.

14       Q.   While you were supervising Mr. Greene, did you guys

15   talk about Lockdown Familia, his record producing business?

16       A.   We've talked -- we've talked about this stuff.

17       Q.   Fact, Mr. Greene told you that Lockdown Familia is a

18   production company to try and promote artists -- musical

19   artists, correct?

20       A.   Yes, sir.

21       Q.   Mr. Greene told you that he was involved in that

22   business promoting musical artists; is that correct?

23       A.   Yes, sir.  And we've -- on numerous occasions we've

24   talked about other business ventures that Mr. Greene wanted

25   to do.  And each and every time I told Mr. Greene, provide

1    documentation about what you're doing.  He talked about

2    Lockdown Familia.  I've never seen any paperwork,

3    documentation, pay stubs, or anything of his business

4    ventures.

5        Q.   You never saw any pay stubs from Lockdown Familia?

6        A.   No paperwork, nothing.  No titles that it's in

7    business.

8        Q.   You don't dispute that he's promoting artists and

9    putting on concerts in the local area, correct?

10       A.   I have no proof.  And prior to this we -- I wouldn't

11   say a rough history, but this -- Mr. Greene has been

12   deceitful with me in the past.  So with him being deceitful

13   in the past, I've always required Mr. Greene to send me

14   paperwork and documentation.  Even before Kids Urban Street

15   there were two other employments that he had prior to that

16   that he was found to deceive me about as well.  So pretty

17   much he was -- Mr. Greene understood that he was on pretty

18   much, for lack of a better word, a short leash, and that he

19   needed to provide documentation for everything he was doing.

20       Q.   But he told you he was working through this Lockdown

21   Familia to promote artists, correct?

22       A.   Yes, sir.  But he also told me he had other jobs

23   that he was not found to be working at either that we haven't

24   discussed.

25       Q.   And he's told you that the artists that this record

1    label produces actually sold CDs and had put on successful

2    concerts?

3        A.    He's never explained to me, nor has he proven or

4    shown documentation to that effect.

5        Q.    When Mr. Greene first came under your supervision,

6    you talked with Ms. Neal about Mr. Greene's employment with

7    her companies; is that correct?

8        A.    Yes.

9        Q.    And she confirmed his employment, correct?

10       A.    That one time, yes.

11       Q.    Which if we --

12       A.    I would give Mr. Greene the Kids Urban Street, but

13    after he left, we had two other incidents that he claimed

14    employment where he was not working.  So it's hard, in my

15    book, to establish that without having any documentation.  We

16    had one incident where he was working for his uncle or cousin

17    at an auto body shop.  He told me, Officer Strong, I started

18    working today.  I'm being paid this amount of money, and

19    everything is going well.  I have to hurry up and get out of

20    the office and get back to work.

21            The very next day I went to his uncle's business at

22    the auto body shop.  He told me, Brian is not working here

23    yet.  What I told Brian, Brian and a friend of his wanted to

24    open up a detailing shop in an empty bay, but until I get the

25    detailing done here and get the car out of the way, they

1     haven't started yet.

2          At the same time Mr. Greene reported that he was

3     working at a barbecue restaurant in Mentor, Ohio.  After many

4     phone calls, Brian had never worked there.  I called day,

5     night, evening, and eventually I showed up at the barbecue

6     restaurant -- this was all in April or May -- Mr. Greene was

7     found not to be working there.

8          Q.   And this occurred in April?

9          A.   April and May.

10         Q.   And May?

11         A.   Which may not be in those initial chronos.

12         Q.   You just referred to -- it's chronos; is that

13    correct?

14         A.   I do a lot of dictating, and sometimes -- with the

15    use of tape, sometimes what happens is the chronos get

16    deleted.

17         Q.   So I take it you understand that there's nothing in

18    your chronos from April or May of this year that indicate

19    that Mr. Greene told you he was working at a barbecue

20    restaurant and that you went to these extraordinary lengths

21    to try and confirm that employment and it came up that he was

22    not employed?  Nothing of that nature appears in your

23    chronos, right?

24         A.   No, it's not.

25         Q.   And the reason those aren't in your chronos is

1    because you have trouble running the dictation machine?

2        A.    They've probably been deleted on the dictation, and

3    for the purpose of court, that's fine, and I'll concede that.

4    However, once we come back to the Connect Clothing Store, it

5    just shows a pattern of Mr. Greene's deceitfulness.  Would I

6    wage war over the barbecue joint or working at his uncle's

7    body shop, no, I wouldn't.  But the pattern has been

8    established with the Urban Street -- more than enough to show

9    Mr. Greene's deceitfulness.

10            As well as what's established inside the chronos is

11    Mr. Greene's same pattern when he was in Columbus.  He would

12    work enough to keep the PO off his back, try a business

13    venture.  When Mr. Greene get tired of reporting in for the

14    Breakfast Club, that's when Mr. Greene decided to go into --

15    sign up for Youngstown State University.  Then, come to find

16    out, once that's done -- he never finished the paperwork --

17    followed through with that paperwork as well.

18        Q.    Let me see if I understand.  You said Mr. Greene

19    would work enough to keep the PO off his back.

20        A.    Not to much -- not to much -- he would try to -- he

21    would do a little job here, then not work, then work.  It's

22    the same -- pretty much the same pattern that he's doing in

23    Columbus that he's doing in Youngstown.

24        Q.    You weren't supervising him in Columbus?

25        A.    No.  I can look at the chronos and it's deja vu.

1    Change the name of employer, change the date, change time.

2    It's pretty much the same thing.

3        Q.   Are you trying to say that the information in the

4    chronological reports from Columbus verifying the different

5    places that Mr. Greene was working at are not accurate?  Is

6    that what you're testifying to?

7        A.   Not so much to the accuracy, but to the usefulness

8    as to how much employment was Mr. Greene working.  There is a

9    lot you can do to shimmy around -- get around the system.

10   Let's be honest.

11       Q.   So he was working --

12       A.   Let's talk full-time employment.

13       Q.   So Mr. Greene was working, in your opinion, enough

14   to try and get by under supervision; would that be an

15   accurate statement?  But not seriously, in your opinion,

16   trying to get full-time 40-hour-a-week employment?

17       A.   No.  No.

18       Q.   But he was working at various places to try and at

19   least --

20       A.   He would --

21       Q.   -- satisfy the requirement that he be working?

22       A.   Not so much satisfy the requirement.  He would get a

23   job, then, once -- he would say he had a job, and then, once

24   the job's been verified, Mr. Greene is off to his next what

25   can I do next to hold off -- what's the next move.  That's

1    what it comes down to.

2        Q.   Did you ever do, yourself, any investigation into

3    Lockdown Familia to try and determine whether or not it

4    was --

5        A.   No.

6        Q.   To try to determine these guys were putting on

7    shows?

8        A.   No.  Mr. Greene was instructed to provide

9    documentation if he was going to use that for employment,

10   which he did not.

11       Q.   Is that in the chronos?  That he was told to provide

12   documentation --

13       A.   Yeah.

14       Q.   -- regarding Lockdown Familia.

15       A.   Any business effort -- Lockdown Familia wasn't the

16   only thing he tried to do.  There was other business stuff

17   that he was instructed to provide paperwork for.

18       Q.   Connect Clothing, you're saying that -- that is a

19   clothing store; is that correct?

20       A.   Yes, it is a clothing store.

21       Q.   Did you check and see if that was an incorporated

22   business -- and, in fact, you did check and verify that it

23   was a business, correct?

24       A.   Yes, it was.

25       Q.   But it's your opinion that it's just a place for

1    people to come and hang out, and is acting as a cover for

2    some other kind of activity?

3        A.    In my honest opinion, I believe so.

4        Q.    Because people drive fancy cars there and young men

5    gather?

6        A.    Because of my eight years of experience dealing with

7    the streets and understanding my clients and looking at their

8    history, I think I can make an educated assumption.

9        Q.    What's your educated assumption?

10       A.    That, in my mind, the store is being used as a

11   front.

12       Q.    For what?

13       A.    For some other illegal activity.  I'd probably say

14   drug dealing, but I don't have any proof.  I've said that

15   already, though.  I don't have no proof at all.  However,

16   Mr. Greene was still deceitful in his employment there.  How

17   can you work at a place you don't know who works there, then

18   he comes up with Beth Neal's name, that she's the owner, then

19   she's not.  Just more patterns of Mr. Greene's deceitfulness.

20   If there was a legitimate job, you wouldn't have a problem

21   stating who you work for.

22       Q.    It's a store that exists, that's incorporated, that

23   Mr. Greene told you that he worked for; is that correct?

24       A.    Yes, sir.

25       Q.    You don't dispute that it's a business that exists;

1    is that right?

2         A.   It does exist.

3         Q.   And Mr. Greene -- you're just saying, then, he's

4    working there, it's just a cover for something else?

5         A.   I'd like to think so.

6         Q.   You work in Youngstown, correct?

7         A.   Yes, sir.

8         Q.   And have you ever had the opportunity, through

9    supervising your other clients or going around town, to see

10   the advertisements that have been put out for the Lockdown

11   Entertainment or Lockdown Familia to show the different acts

12   they're putting at the Red Room or nightclubs or bars?

13        A.   No, I have not.

14        Q.   Through your work in Youngstown, have you ever had

15   an opportunity to hear about or deal with an Attorney Samuel

16   Ameneora, A-M-E-N --

17        A.   Ameneora.

18        Q.   -- E-O-R-A.

19        A.   Yes.

20        Q.   He is a licensed attorney?

21        A.   Yes, he is.

22        Q.   Respectable, reputable attorney?

23        A.   Yes, he is.

24        Q.   And if he has stated he has been retained to

25   incorporate Lockdown Familia, with the incorporators being

1    Mr. Greene and a couple other individuals, and they have a

2    client who's sold over 3,000 records to date, you wouldn't

3    have any reason to doubt Attorney Ameneora's statements on

4    that?

5        A.    What date was that letter?

6        Q.    Yesterday.

7        A.    Mr. Greene hasn't been in contact with me since

8    November the 1st.  I don't know what Mr. Greene has been

9    doing.

10        Q.    So would it be accurate to say, to the extent

11    Mr. Greene was or was not working for this Lockdown Record

12    Company, that was just something that you and he did not

13    discuss, and you didn't -- so you didn't consider it as

14    satisfying the requirements?

15        A.    Without that documentation, no, I wouldn't call that

16    his employment.  Because of my past dealings with

17    Mr. Greene, he needed to submit documentation for everything.

18    Without documentation, it's nothing.

19        Q.    You're not able to say that he wasn't working at

20    this company, this company hasn't promoted an artist that

21    sold multiple CDs?  It's just something that you and

22    Mr. Greene haven't discussed?

23        A.    No.

24            MR. PATTON:   Those are my only questions.

25

1                          REDIRECT EXAMINATION

2    BY MS. SANNER:

3

4        Q.    Mr. Greene has provided you with some verification

5    of various employments that he's had over the time period; is

6    that right?

7        A.    He -- he's provided pay stubs when he worked at

8    American Maintenance, which was owned by -- I believe it was

9    his aunt.  I had one or two pay stubs from American

10   Maintenance.  After we had a situation with him working for

11   his uncle at the auto body shop, he came in with some

12   paychecks for that.  That was -- and that was it.

13       Q.    What was the amount on those paychecks?  If you

14   remember.

15       A.    They're in the file.  In the month of January of

16   2005, he lists on his monthly report employment with Tag Me

17   Designs, Royal Oaks Mall, Akron, Ohio, no pay stubs submitted

18   as verification of that.  For the month of February 2005, he

19   lists American -- he lists American Maintenance as

20   employment, with -- we have two pay stubs here -- for

21   February he listed American Maintenance, there was no pay

22   stubs.  I guess maybe he was in his first 30 days, no pay

23   stubs were submitted.  But for the month of March -- for the

24   month of March of 2005 he lists American Maintenance, he

25   submitted two pay stubs.  One for pay date 3/15/2005, which

1    lists a total of 10 hours, which gave him a net pay of $52;

2    and then the second pay stub was pay date March the 31st, for

3    a total of eight hours, for a total pay of $58.68.  That was

4    for the month of March.

5         Then, if we go back to his job search forms, back to

6    the Breakfast Club, in April he lists the auto body, which is

7    owned by his uncle or cousin.  He lists for 5/6 a paycheck

8    for $400, Check No. 1046.  And then a month later, in May, he

9    reports owner auto body as well as American Maintenance.

10   Submitted a paycheck, a month later, in consecutive order,

11   which I -- it's tough to say.  Maybe they -- I mean, whether

12   or not they wrote any more checks in that month time frame,

13   but Check 1047 in the amount of $375; Check 1052 in the

14   amount of $200; Check 1056 in the amount of $300, all for R&R

15   Auto Body.  And for American Maintenance he has a pay date

16   for May the 14th, he did get 37 hours in at that point in

17   time for $203.

18        The month of July, no employment.  June and July --

19   June he listed down full-time student at YSU, which we found

20   that he really was not attending YSU.  Then, the month of

21   July, no employment listed.  Then we go to August, Kids Urban

22   Street, the Connect Store at 2600 Market Street, which two

23   stores are not the same name or not affiliated.  And we have

24   September to the Connect Clothing Store, no pay stubs

25   submitted as verification either.  And October, same thing,

1    Connect Clothing Store, no pay stubs submitted for

2    verification of employment.

3        Q.    And he was repeatedly asked for verification of

4    employment?

5        A.    Of course.  Yes, ma'am.

6        Q.    And he expressed interest in a lot of different

7    things that he could be employed in such as school,

8    barbering, personal training --

9        A.    Personal fitness.

10       Q.    -- professional football?

11       A.    Personal fitness.

12       Q.    And none of those actually had any follow through?

13       A.    No, ma'am.

14            MS. SANNER:  I have nothing further for this

15    witness.

16            MR. PATTON:  I have nothing further for this

17    witness, Your Honor.

18            THE COURT:  Thank you.  Anything further?

19            MS. SANNER:  The Government has no further

20    witnesses, Your Honor.

21            MR. PATTON:  Your Honor, can I have a few minutes to

22    consult, talk with Ms. Sanner?

23            THE COURT:  We'll take five minutes.

24            (Pause in the proceedings.)

25            MR. PATTON:  Your Honor, I would like to introduce a

1    letter that I have from Attorney Samuel Ameneora.

2    Mr. Townley, the investigator from my office, spoke with

3    Mr. Ameneora yesterday and confirmed basically what's in --

4    the contents of this letter.  Which is, that this attorney

5    has been retained by Mr. Greene and two other gentlemen that

6    he is partners with to incorporate their business of Lockdown

7    Familia, which is a record producing business, and that their

8    company has sold over 3,000 CDs to date, and that, you know,

9    the attorney is working on Mr. Greene's behalf to accomplish

10   that.  And that's marked as Defendant's Exhibit A.

11           (Defendant's Exhibit A marked for identification.)

12           THE COURT:  That will be admitted as Defendant's A.

13           MR. PATTON:  Your Honor, I'm not going to

14   admit these into evidence, just ask you to take a look at

15   them.  These are just different promotional items that this

16   Lockdown Familia has issued promoting the various events that

17   they have produced.  Which generally are, you know,

18   nightclubs or stage shows promoting the artists that

19   Mr. Greene, through this company, are producing and

20   supporting.

21           THE COURT:  This says that -- I'll read it into the

22   record.  Have you seen this?

23           MS. SANNER:  Yes, Your Honor.

24           THE COURT:  "To whom it may concern:  Please be

25   advised that I represent Brian Greene and Lockdown," that's

1    one word, L-O-C-K-D-O-W-N, "Familia," F-A-M-I-L-I-A, "Inc.  I

2    have been retained to incorporate Lockdown Familia, Inc.,

3    with the incorporators being Kevin Carter, Brian Greene, and

4    Benjamin Phillips.  The purpose of the incorporation is to

5    conduct business in the recording business and entertainment

6    business.  A CD produced by that company has sold over 3,000

7    copies to date."  I don't know what a CD means.

8          MR. PATTON:  It's a compact disc, Your Honor.

9          THE COURT:  "Brian Greene and the others have been

10   conducting entertainment business in the Youngstown, Akron,

11   Columbus, and Canton areas for profit.

12         "Due to my previous legal commitments, I am unable

13   to attend today's court proceedings.  If you have any other

14   questions, please feel free to call me."  And it's Samuel

15   Ameneora, A-M-E-N-E-O-R-A.

16         MR. PATTON:  Attorney Ameneora is a master in the

17   juveniles courts over in the Youngstown area, and today is

18   their hearing date.  So he was involved doing that.

19         I've also shown these to Ms. Sanner, and I just ask

20   the Court to review them.  I'm not going to introduce them as

21   exhibits, but just ask that you consider them.

22         THE COURT:  Well, these two -- two of these are back

23   in 2005.  VIP artist Tim Jones is August 16, 2005, and Young

24   Jeezy, J-E-E-Z-Y, is Thursday, October 6 --

25         MR. PATTON:  That's correct, Your Honor.

1          THE COURT:  -- 2005.

2          MR. PATTON:  Mr. Greene, along with the other

3    gentlemen involved in this company, have been doing this work

4    since back in August of -- excuse me, October of last year.

5          THE COURT:  He hasn't been able to show Mr. Strong

6    any profits, I take it?

7          MR. PATTON:  That is accurate.  And we're not

8    disputing that he did not report to Mr. Strong that he made

9    any profits off this.  But it is our -- we are submitting

10   that Mr. Greene was engaged in this, that it is employment.

11   Like any small business, you know if it fails, you end up not

12   making anything; if it works, you end up being successful.

13   But that is the evidence that we have to present on the

14   issue, Your Honor.

15         THE COURT:  Thanks, sir.

16         Do you have any closing statement you want to make,

17   Ms. Sanner?

18         MS. SANNER:  Well, the Government would note that

19   the Defendant has been missing in action since November of

20   2005 when he stopped reporting all together.

21         This record promoting company is not incorporated

22   yet.  I don't have any aspersions on Attorney Ameneora, who

23   was conveniently hired yesterday, but it's consistent with

24   Mr. Greene's behavior to date.  Which is to wait until the

25   heat's about to come down on to him, and then find a job.  In

1    this case he's found this record company that he can

2    incorporate.

3            And he has been rather remarkable in his ability

4    over two years to get out from under supervision by either

5    moving or getting a new job or getting a new probation

6    officer.  Doing the bear minimum to keep his probation

7    officers at bay and not actually working or contributing

8    meaningfully to society.

9            His pattern shows not just a disrespect for the

10   probation office and the Court, society, but they've also

11   shown a tendency to escalate.  Following his failure to

12   repeatedly gain employment, he started with the -- continued

13   more heavily with the drug use, and has four recent tests

14   positive for marijuana.  When he was referred then to PSI

15   Care for counseling, he just didn't show up.  He didn't get

16   tested, he didn't show up.  And the Government believes that

17   the Court should sentence the Defendant to the high end of

18   the range for this.

19           MR. PATTON:  Your Honor, with regard to the

20   allegations of marijuana use, Mr. Greene does not dispute

21   that.  He admits that he violated the conditions of his

22   supervised release by using marijuana.

23           Mr. Greene has been working while he has been under

24   supervision.  The testimony regarding the time that

25   Mr. Greene was in the Southern District of Ohio showed that

1    he did have employment.  He was not employed every day during

2    that year, but he was employed at at least three different

3    places that were confirmed, and -- that he was working there.

4         In the Northern District of Ohio, Agent Strong, you

5    know, listed the Tag Me Designs, where he was working in

6    January of '05, and that was confirmed through Ms. Neal.

7    Then he worked at American Maintenance, that he worked there

8    and got paid checks from there in March.  And again in May of

9    2005 at the R&R Auto Body, which was, you know, a relation to

10   Mr. Greene, and you have checks there for $400, $375, $200,

11   $300.

12        You have Mr. Greene reporting that he was working at

13   Connect Clothing.  You know, Agent Strong can believe what he

14   wants to believe about whether or not it's a front for

15   something else, but it's an incorporated business, a business

16   that exists, Mr. Greene was working there.  And the record

17   label that you have -- the letter, while it's dated

18   yesterday, it's not that Mr. Ameneora -- I'm sorry, I keep

19   mispronouncing the man's name.  It's not that he was hired

20   yesterday.  That's when he wrote the letter that he has been

21   retained to do this.

22        And, you know, Apple Computer Company started by two

23   guys in their garage building computers.  Where, if somebody

24   had said confirm to me that you're working, and Steve Job

25   says, me and my buddy, Mr. Wozniak, are building these new

1    things called computers in my garage, I'd be willing to bet

2    that most people would have said, that's not a real job.

3    Well, now Mr. Job is one of the richer men in the country.

4         I'm not saying that this record company is going to

5    make Mr. Greene a record industry mogul.  But you have in the

6    music industry -- especially, I would submit, in the portion

7    of the music industry that deals with rap artists -- a lot of

8    the artists that have become very popular started off

9    starting their own production company, working their way up

10   through performing in smaller venues until they become

11   successful.  Again, I'm not trying to intimate that this is a

12   major record label that Mr. Greene is working on, but he's

13   working at trying to get it off the ground.

14        So, while, obviously, you're going to find him

15   violating the conditions of his supervised release by using

16   marijuana, I would submit that the Government has not proven

17   by a preponderance of the evidence that Mr. Greene did not

18   comport with the requirement that he be employed.

19        I understand, Your Honor, we had this argument

20   earlier in the day with another supervisory revocation

21   proceeding where the issue came up about, you know, whether

22   you should give a sentence within the range suggested by the

23   revocation table and the guidelines or whether you should

24   give a sentence that's outside that range based on any types

25   of departures.  You know, I would point out to Your Honor the

1    same thing that I did this morning, that downward departures

2    for cooperation are not given out because the Government

3    feels that they just want to give this particular Defendant a

4    break.

5              Departures for cooperation are earned.  The

6    Government gets consideration in return for the reduced

7    sentence.  The Government gets the benefit of cooperation

8    that helps them prosecute and incarcerate other people.

9    That's how Section (5)(k) works.  The only way you get a

10   (5)(k) motion is if you provide substantial assistance in

11   investigating and prosecuting other people.

12             So while we understand that you are going to revoke

13   Mr. Greene's supervised release for his marijuana usage, I

14   would submit that a sentence in the middle of that range or

15   towards the lower end would be appropriate.

16             And Mr. Greene would like to make a statement to

17   Your Honor.

18             THE COURT:  Mr. Greene.

19             THE DEFENDANT:  How you do, Your Honor.  Last time I

20   seen you, you sentenced me here in 1999, I was 20 years old.

21   And I just want to tell you that prison was one of the best

22   things you could have did for me.  But it seems I still got

23   one problem.  And my only problem to present to this Court is

24   I got a drug problem.  As far as my business ventures, I'm

25   trying to get them going.  I've been establishing --

1    everything's coming good, but I do need a little time and

2    help for my drug problem.  I did say thank you for sentencing

3    me previously because it did help me be a better man.

4         THE COURT:  Thank you.  Mr. Greene was -- in May of

5    1999 he was looking at 121 to 151 months.  The Government

6    filed a (5)(k) Motion, and we gave him a huge reduction,

7    which I consider a huge reduction, down to 60 months.  And

8    part of the program, as we all know now, was that he was to

9    refrain from any use of a controlled substance, he was to

10   participate in drug testing and treatment for substance

11   abuse, and, I'm quoting, "The Defendant shall work regularly

12   at a lawful occupation unless excused by the probation

13   officer for schooling, training, or other acceptable

14   reasons."

15        Obviously he didn't refrain from use of a controlled

16   substance.  According to Mr. Strong he did not -- while he

17   participated in drug testing, most of them showed substance

18   abuse, and then he just stopped showing up to the drug

19   testing.  And I don't think we've heard here that he's

20   working regularly at a lawful occupation, and he wasn't

21   excused by the probation officer.  So I find that in all

22   three of those areas he has failed to abide by the rules of

23   supervision.  As Mr. Patton indicated in his closing remarks,

24   the degree of proof here is by a preponderance of the

25   evidence, and as I say, I don't have any problem in finding

1    by a preponderance of the evidence that Mr. Greene did

2    violate those conditions of his supervised release.

3         In determining a modification of supervised release,

4    the Court is to consider the factors set forth in 18 United

5    States Code Section 3553(a)(1), and these factors include the

6    nature and circumstances of the offense, the history and

7    characteristics of the Defendant, and the need for the

8    sentence to punish, deter, protect the public, and

9    rehabilitate.  The Court should also consider the types of

10   sentences available, relevant policy statements, and the need

11   to avoid sentencing disparities.

12        The Defendant's violations here, taken together, do

13   constitute a Grade C violation, and the Defendant's criminal

14   history category is III.  Based upon revocation of supervised

15   release, a guideline range of imprisonment under the

16   sentencing guidelines is five to 11 months of imprisonment.

17   We do have the option, under the sentencing -- I guess, since

18   they're advisory, it's not an option anymore, but it's

19   something within the discretion of the Court to impose a

20   sentence that's beyond the guidelines.  And in this case, I

21   think this matter calls for that.  The note to the guideline

22   states, "Where the original sentence was the result of a

23   downward departure," which, of course, it was a big downward

24   departure here, "an upward departure may be warranted."

25        Upon consideration of 18 United States Code Section

1    3583(e)(3) and US Sentencing Guidelines, Chapter 7, the Court

2    now revokes the Defendant's supervised release and imposes a

3    sentence of imprisonment of 18 months with no supervised

4    release thereafter.

5         We note that even with the 18 months on top of the

6    60 that he was previously sentenced to he's still well under

7    the guideline range that he faced when he was here in 1999.

8    So we're making it 18 months effective immediately, and

9    there'll be no supervision afterward.

10        So I hope you will get a chance to get ahold of

11   yourself, Mr. Greene, and we'll get good reports from now on.

12   Court's adjourned.

13        MR. PATTON:  You need to inform Mr. Greene of his

14   appeal rights.

15        THE COURT:  You have a right to appeal.  You have 10

16   days to appeal.  If you don't have a lawyer -- if you can't

17   afford a lawyer, one will be appointed for you to represent

18   you.

19        MR. PATTON:  Thank you.

20

21        (Hearing concluded at 3:05 p.m.)

22

23

24

25

1    C E R T I F I C A T I O N

2

3         I, Sondra A. Black, a Court Reporter and Notary

4    Public in and for the Commonwealth of Pennsylvania, do

5    hereby certify that the foregoing is a true and accurate

6    transcript of my stenographic notes in the

7    above-captioned matter.

8

9

10

11                              Sondra A. Black

12

13

14

15                              Dated: May 15, 2006

16

17

18

19

20

21

22

23

24

25